## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| (1) THOMAS E. WHEELER,<br>(2) FITZGERALD FARMS, LLC;<br>on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>(1) EXXON MOBIL CORPORATION; and<br>(2) EXXONMOBIL OIL CORPORATION,<br>(including affiliated predecessors and affiliated successors),<br><br>      Defendants. | Civil Action No. CV-19-4025 |

## PLAINTIFFS' ORIGINAL COMPLAINT--CLASS ACTION

Thomas E. Wheeler ("Wheeler") and Fitzgerald Farms LLC ("Fitzgerald Farms"), a Kansas limited liability company, on behalf of themselves (collectively "Plaintiffs") and the Class of all other persons similarly situated, file this Original Class Action Complaint against Exxon Mobil Corporation and ExxonMobil Oil Corporation (including affiliated predecessors and affiliated successors) (collectively "Defendants"), and allege and state as follows:

### SUMMARY OF ACTION

1. Plaintiffs and the Class bring claims against Defendants concerning Defendants' actual, knowing, and willful underpayment or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells through improper accounting methods (such as not paying on the starting price for gas products but instead

taking improper deductions) and by failing to account for and pay royalties, all as more fully described below.

2.      Plaintiffs bring this Original Class Action Complaint to rectify Defendants' scheme.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction over these state-law claims pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy here exceeds $5 million.

## PARTIES

4.      Plaintiff Thomas A. Wheeler is a citizen of Kansas. Wheeler owns royalty interests pursuant to an oil and gas lease (which lease is in Defendant Exxon Mobil Corporation's possession) in Defendant Exxon Mobil Corporation's operated unit, the Perry Rowe Unit located in Latimer County, Oklahoma.

5.      Wheeler's oil and gas lease includes the following royalty provision, which has been violated by Defendants:



6.      Plaintiff Fitzgerald Farms, LLC is a limited liability company organized under Kansas law. Fitzgerald Farms owns royalty interests pursuant to an oil and gas lease (which lease is in Defendant ExxonMobil Oil Corporation's possession) in Defendant

ExxonMobil Oil Corporation's operated unit, the Fitzgerald Unit located in Texas County, Oklahoma.

7.      Fitzgerald Farms's oil and gas lease includes the following royalty provision, which has been violated by Defendants:

> 1st. To deliver to the credit of lessor, free of cost, in the pipe line to which lessee may connect his wells, the equal one-eighth part of all oil produced and saved from the leased premises.
> 2nd. To pay the lessor one-eighth, at the market price for the gas so used, for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.
> 3rd. To pay lessor for gas produced from any oil well and used off the premises or for the manufacture of casing head gas, one-eighth, at the market price for the gas so used, for the time during which such gas shall be used, said payments to be made_____ _quarterly.
> If no well be commenced on said land on or before the __29th__ day of ___May___, 19_27_

8.      Defendant Exxon Mobil Corporation ("Exxon Mobil") is a for profit business corporation organized under New Jersey law and headquartered in Irving, Texas. Exxon Mobil may be served with process by serving its registered agent, Corporation Service Company, 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

9.      Defendant ExxonMobil Oil Corporation ("ExxonMobil Oil") is a for profit business corporation organized under New York law and headquartered in Irving, Texas. ExxonMobil Oil may be served with process by serving its registered agent, The Prentice-Hall Corporation System, Kansas, Inc. at 2900 SW Wanamaker Drive, Suite 204, Topeka, KS 66614.

10.     Exxon Mobil and ExxonMobil Oil are related entities, with ExxonMobil Oil operating as a subsidiary of Exxon Mobil Corporation. Before November 1999, Exxon Corporation was an entirely separate company from Mobil Corporation. The two companies did not share any operations in Oklahoma. They were supposed to compete against each other to obtain leases in Oklahoma, and they each had their own royalty

owners. On November 30, 1999, Lion Acquisition Subsidiary Corporation, a subsidiary of Exxon Corporation, merged into Mobil Corporation. Exxon Corporation changed its name to Exxon Mobil Corporation. Mobil Corporation survived the merger as Mobil Corporation and became a wholly owned subsidiary of Exxon Corporation. On June 1, 2001, Mobil Oil Corporation, a subsidiary of Mobil Corporation, changed its name to ExxonMobil Oil Corporation. ExxonMobil Oil Corporation is simply the new name for Mobil Oil Corporation.

11.     Defendants and their affiliated predecessors, successors, and current and past employees, agents, representatives, attorneys, or others acting on their behalf and all those to whose prior leasehold interests they have succeeded and for whom they are legally liable whether by merger, assignment, or otherwise shall herein collectively be known as "Defendants."

12.     The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by officers, agents, affiliates, employees, or representatives, while actively engaged in the conduct or management of Defendants' business or affairs, and within the scope of their employment or agency with Defendants.

## CLASS ACTION ALLEGATIONS

13.     Plaintiffs bring this action, pursuant to Federal Rule 23(a), (b)(2), and (b)(3), as representatives and on behalf of the following multi-state class (the "Class"):

> All last successors in interest to royalty owners in wells where Defendants (including their affiliated predecessors and affiliated successors) were the operator (or a working interest owner who marketed its share of gas and directly paid royalties to the royalty owners), payable under any lease that contains an express provision stating that royalty will be paid on gas used off

the lease premises (Express Fuel Clause). These Class claims relate to royalty payments for gas and its constituents (such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate).

**SUBCLASS #1**: All last successors in interest to royalty owners in Oklahoma wells where Defendants (including their affiliated predecessors and affiliated successors) were the operator (or a working interest owner who marketed its share of gas and directly paid royalties to the royalty owners) from inception to April 30, 2002. The Subclass claims relate to royalty payments for gas and its constituents (such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate).

Excluded from the Class and Subclass are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) the State of Oklahoma or any of its agencies or departments that own royalty interests; (3) Defendants, their affiliates, predecessors, and employees, officers, and directors; (4) any entity and their affiliates ) that produces, gathers, processes, or markets gas; (5) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect at the time suit was filed herein; (6) overriding royalty owners and others whose interest was carved out from the lessee's interest; (7) royalty owners who have already filed and still have pending lawsuits for underpayment of royalties against Defendants at the time suit is filed herein. And also excluded from the Subclass only: (8) royalty owners only to the extent they take gas in-kind, if any; and (9) royalty owners only to the extent receiving Oklahoma "Blanchard" payments.

14.    The members of the Class and Subclass are so numerous that joinder of all members is impracticable.

15.    Defendants operate or have operated thousands of Class and Subclass Wells that produce gas. Defendants hold a working interest in these Wells, with at least one, and usually multiple, royalty owners for each well.

16.    Defendants have within their possession or control records that identify all persons to whom they (including affiliated predecessors and those for whom they are

legally responsible) have paid royalties from Class and Subclass Wells during the Class Period.

17.    The questions of fact or law common to Plaintiffs and the Class and Subclass include, without limitation, one or more of the following:

    a.    Whether the multi-state Class leases have an Express Fuel Clauses.

        i.    If so, whether Defendants failed to pay for the gas from Class Wells used off the leased premises.

        ii.    Whether Class-wide damages can be calculated for Plaintiffs' theories of liability.

    b.    Whether Plaintiffs and members of the Oklahoma Subclass are beneficiaries of the implied Marketable Condition Rule (MCR), which requires Defendants to sever the gas from the ground and to prepare the gas for market at Defendants' sole expense.

        i.    If so, whether: 1) the Midstream Costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for market such that none of them should have been deducted from royalties but all of them were; or 2) whether the market for gas occurs before GCDTP are incurred such that the Class's claim is only for excessive deductions of Midstream Costs.

        ii.    If not, whether the Subclass members were party to a lease that expressly allows deduction of all of the GCDTP Midstream Costs ("Express Deduction Lease" or "ED Lease"), such that these Class members have a claim only for excessive deductions of Midstream Costs, and if so, whether the Midstream Costs actually deducted were excessive in amount.

    c.    Whether Defendants paid royalty to Plaintiffs and members of the Subclass for all valuable constituents coming from their wells and which inured to Defendants' benefit either: 1) through credit toward the Midstream Costs; or 2) by contractual consideration in-kind to a midstream company (such as drip condensate, helium, liquefied nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U).

      d.     Whether Defendants (including any of their affiliates) paid royalty to Plaintiffs and members of the Class based on a starting price below what Defendants or their affiliates received in arm's-length sales transactions.

      e.     Whether Subclass-wide damages can be calculated for Plaintiffs' theories of liability.

18.    Plaintiffs are typical of other Class and Subclass members because Defendants paid royalty to Plaintiffs and other Class and Subclass members using a common method. Defendants paid royalty based on the net revenue Defendants receive under their gas contracts which terms royalty owners do not know or approve. The contracts are for services necessary to place the gas and its constituent parts into marketable condition, as the gas is not marketable at the wellhead, so they can be sold into recognized, active, and competitive commercial markets. The gas contracts also barter away fuel used off the leased premises in exchange for midstream services.

19.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiffs are royalty owners to whom Defendants paid royalty. Plaintiffs understand their duties as Class and Subclass representatives. Plaintiffs have retained counsel competent and experienced in class action and royalty owner litigation.

20.    This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class and Subclass, and those common questions predominate over any questions solely affecting individual members of such Class and Subclass. *See* ¶ 17, above. There is no need for individual Class or Subclass members to testify in order to establish Defendants' liability to or damages sustained by Plaintiffs and members of the Class and Subclass.

21.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class and Subclass. Class action treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense, and effort on the part of those individuals, witnesses, the courts, and/or Defendants. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class and Subclass members.

22.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class or Subclass. Joinder of all Class or Subclass members would be either highly impracticable or impossible. And the amounts at stake for individual Class or Subclass members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Defendants will likely retain the benefit of their wrongdoing.

## GAS INDUSTRY BACKGROUND

23.     The members of the Class and Subclass own royalty interests in wells that produce gas and constituents that are transformed into marketable products and sold into the established commercial markets for those products.

8

24.     Defendants' method for calculating royalty to the members of the Class and Subclass is subject to uniform accounting procedures and implied marketable product law for the Subclass.

25.     For the Subclass, Oklahoma law requires the lessee, such as Defendants, to bear all of the costs of placing gas and its constituents into "Marketable Condition" products.

26.     Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

27.     Only after a given product is marketable does a royalty owner in Oklahoma have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

28.     With respect to leases containing Express Fuel Clauses for the Class, Defendants owed a duty to pay royalty on all fuel used off the leased premises.

### The Lessor-Lessee Relationship

29.     The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue.

30.    But the oil and gas companies have used undisclosed internal accounting practices to try to keep for themselves as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty case.

31.    Rather than adopting transparency in their royalty calculation formula, Defendants, like most lessees, have guarded their production and accounting processes as confidential or proprietary, thereby depriving the royalty owners of information necessary to understand how Defendants calculate royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling the lessee to breach the oil and gas lease without accountability.

32.    With respect to Express Fuel Clause leases, Defendants do not disclose in any respect the amount or volume of gas used off the leased premises for which royalty is owed. Indeed, the uniform check stubs used by Defendants throughout the country provided no indication that fuel used off the lease was not being paid for.

33.    If and when one or more of the royalty owners learn of these "breaches," the royalty owner has only three—all poor—options: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from thousands of other unknowing royalty owners; (2) do nothing since the "breaches" only result in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners

plus-prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

### Residue Gas, Helium, Nitrogen, and Natural Gas Liquids Production

34.    The Class and Subclass members' gas is gathered from each well, dehydrated and compressed, through underground gathering lines crossing many miles of land to processing plants where the raw gas is transformed into two primary products—methane and fractionated natural gas liquids ("NGLs"). Once homogenized as fungible products, the residue gas and NGLs are sold in the commercial market.

### Wellhead (Basic Separation and Gas Measurement)

35.    The diagram below illustrates the gas conditioning process.



*See* http://www.kgs.ku.edu/Publications/Oil/primer13.html

36.    Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[1] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[2] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly in oil and water. The heater-treater is installed, maintained, and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, then usually trucked out and sold (the payment of oil royalties is not at issue in this lawsuit).

37.    Because production over time depletes the pressure of a well, on rare occasion, on-lease compressors are installed to suction gas out of the well or to move the

---

[1]    Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas."

[2]    A minute portion of this raw gas may be used on a few leased lands to heat the farm house pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

gaseous mixture down the gathering lines. But when these compressors are installed, their use requires fuel (the "on-lease compression" or "vacuum compression" cost).

38.    The gaseous mixture produced from a single well cannot be processed economically, so the mixtures from many wells are "gathered" together through gathering lines and delivered to a processing plant for transformation into marketable products and sale into commercial markets. This results in a gathering cost (G). The below diagram provides an overview of the midstream-services deduction process—all of which occurs to a commingled gas stream aggregated from many wells. Defendants do not improperly deduct from royalty any of the costs before the gathering line inlet.

**Midstream Services (GCDTP) Deductions**



39.     As the gaseous mixture from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The meter run must be constantly maintained to record accurate measurements.

40.     Gathering pipelines are usually made of metal that could be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D).

41.     Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression cost (C).

42.     The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Generally lessees, like Defendants, pay no royalty on the revenue generated from the sale of the drip condensate.

43.     Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U"). Lessees, like Defendants, pay no royalty on the volume of L&U.

14

## Natural Gas Processing

44.    Once a sufficient amount of the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

45.    Lessees, such as Defendants, use gas processing plants either owned by them or a third party. Usually an unrelated third party owns the processing plant, but the plant may also be owned in whole or in part by a lessee.

46.    The plant removes impurities that remain in the mixture, such as carbon dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T).

47.    The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), NGLs raw make, and in the Panhandle of Oklahoma, crude helium.

a.    Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas."

b.    The raw make NGLs are used as a feedstock in the petrochemical and oil refining industries; they are a more valuable commodity than methane. To separate the NGLs from the gaseous mixture, they are cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The NGLs move into a liquids pipeline and processed by a fractionator into their marketable products: ethane, propane, butanes, and pentanes plus. In the gas contracts, this process incurs

a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as consideration for other services the midstream company provides.

       c.    Helium is processed into Grade A helium at new processing plants or into crude helium (contaminated with nitrogen) at older plants, which is then processed into Grade A helium at a nearby helium processor (often only a few hundred feet away).

48.    This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Lessees, like Defendants, do not pay royalty on plant fuel, even though it comes from Class Wells.

49.    At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas) and (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium-rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at that point.

### Marketable Condition for the Products

50.    *Methane Gas*.  Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

51.    *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products (ethane, propane, butane, isobutene, natural gasoline, etc.). In computing royalty for NGLs,

16

Defendants improperly deduct processing fees and/or other costs (such as transportation and fractionation, T&F) needed to reach commercially marketable fractionated NGLs.

52.    *Drip Condensate*. Drip Condensate is recovered on the gathering lines and at the inlet to the processing plant, and is essentially in marketable condition when collected.

53.    *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and into parts of Wyoming), helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents but lessees pay little or nothing to the royalty owners. Royalty owners should be paid for the gas and all constituents taken.

**Sale of Products**

54.    To turn the marketable products into money, the producer sells them (or contracts to have them sold) in the commercial market place in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at OPIS, and any other marketable products at the prices established by their respective commercial markets. Lessees, like Defendants, attempt to obscure this fact with self-serving language in gas-marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

55.     The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All of the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. The difference stems from Defendants' market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If Other Products are also produced, they are and must be also priced in a commercial market.

56.     Affiliate gas contracts are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate in the commercial market is the true sale that should be used as the "starting price" for marketable condition gas products.

> a.    Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price and not the higher affiliate/third party price.

b.     WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price." Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third party arm's length sale prices.

57.    Fictitious "sales" (also known as sham sales or conditional sales) are created by lessees in an effort to pass off a non-commercial market sale as if it should be the starting point for royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners. For instance:

a.     Anything of value can be sold at any place and in any condition.

b.     Gas and other minerals can and are routinely sold in the ground, but they are not in marketable condition.

c.     Gas could be sold at the bottom of the hole when it is severed from the surrounding rock and enters the downhole pipe. Although a contract driller might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his drilling services, that agreement does not make the transaction a real market sale.

d.     Gas could be sold "at the wellhead" when the gas is severed from the surface. Although a contract operator might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as

compensation for his well operating services, that transaction does not make it a real market sale.

e.    Gas also could be sold at the gathering line inlet when the gas enters the gathering line and changes custody. Although a contract gatherer might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that transaction does not make it a real market sale.

f.    Gas also could be sold at the processing plant inlet when the gas changes custody to the processing plant. Although a contract processor might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his processing services, that transaction does not make it a real market sale.

g.    The lessee could simply pay for all of these services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market—Index or OPIS.

h.    Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with Midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i)

the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream services that usually passes with a true title transfer and market sale does not happen; (iii) the starting price that would occur with a true title transfer and market sale does not happen. Indeed, the paper title transfer is unnecessary to receiving the Midstream services as the gas could (and sometimes does) receive the exact same Midstream services without the paper title transfer.

i.      All of the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

j.      Midstream services providers are not buyers and resellers of raw gas. They are service providers that convert raw gas into pipeline quality gas so it can enter the Index or OPIS market pools.  Indeed, they are called Midstream servicers, not Midstream purchasers.

**The Many Different Ways Defendants Underpay Royalty Owners**

58.     The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship constantly tempt lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, *and* they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The

21

common thread through all of these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

59.     Defendants represent the royalty calculation on the form of a monthly check stub it sends each royalty owner. The check stub shows each royalty owner's interest and taxes (which are not in dispute here), and volume, price, deductions, and value, all of which are disputed here.

60.     Defendants underpay royalty to Plaintiffs and other Subclass Members in one or more of the following ways:

   a.   Residue Gas. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All of Defendants' gas contracts will show this to be true. But instead of paying on that gross competitive price, Defendants pay on a net price after directly taking or allowing midstream companies to indirectly take Midstream Services deductions (both monetary fees and in-kind volumetric deductions).

   b.   NGLs. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All of Defendants' gas contracts will show this to be true. But instead of paying on that gross competitive price, Defendants pay royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel);

(ii) after deducting processing fees and expenses (often keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs as payment for the processing services); and (iii) after reducing payment by T&F.

c.    <u>Drip Condensate</u>. Plaintiffs and Class and Subclass Members' wells produce heavy hydrocarbons that condense in the pipeline. Defendants, or a third-party on behalf of Defendants (gatherers and/or processors), recover those hydrocarbons for sale. Defendants fail to pay any royalty for that Drip Condensate.

d.    <u>Other Products</u>. Helium is contained in the well-stream produced from Plaintiffs' and many Subclass Members' wells, but Defendants: (i) fail to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deduct processing fees and costs even though the helium is not yet in commercial grade; and (iii) pay at a lower than commercial Grade A price. Often times, Defendants do not pay any royalty at all for Helium, liquid nitrogen, or other products taken from Plaintiffs' and the Subclass Members' wells.

e.    <u>Affiliate Transactions</u>. Defendants entered into non-arm's-length transactions with their midstream affiliates, the terms of which were designed to deprive Plaintiffs and the Subclass Members of their

rightful royalties, while simultaneously generating unlawful profits for Defendants.

61.    Defendants underpay all other Subclass Members, from whom Defendants are legally entitled to deduct post-production Midstream Services Costs, by taking excessive deductions under Midstream Services Contracts that allow excessive monopoly charges for GCDTP services, and further underpay all Class members by refusing to pay royalty on fuel used off the leased premises.

## ACTUAL, KNOWING AND WILLFUL
## UNDERPAYMENT OR NON-PAYMENT OF ROYALTIES

62.    The underpayment and non-payment of royalties are done with Defendants' actual and willful knowledge and intent.

63.    Defendants, however, continued to improperly pay royalty.

64.    In fact, Defendants are well familiar with the fact that many other producers in Oklahoma have resolved the same claims for billions of dollars and have changed their royalty payment practices to cease improperly deducting.

65.    Defendants are no strangers to fraud on royalty owners.

66.    In *Weber v. Mobil Oil Corporation, et al.*, 243 P.3d 1 (Okla. 2010), the Supreme Court of Oklahoma held that class certification was appropriate for claims of fraud, deceit, constructive fraud, and punitive damages against Defendants. The case then settled for $30 million to the settlement class. The settlement class, however, was limited to royalty owners in a single secondary recovery unit known as the Putnam Oswego Unit.

67.    All other royalty owners of Defendants remain harmed, thus the need for this class action lawsuit.

### COUNT I
### BREACH OF LEASE (including implied duties)

68.    Plaintiffs and the Class and Subclass incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

69.    Plaintiffs and the other Class and Subclass Members entered into written, fully executed oil and gas leases with Defendants, and those leases include implied covenants requiring Defendants to prepare the gas and its constituent parts for market at Defendants' sole cost, and for express fuel leases, to pay royalty on fuel used off the leased premises. The leases also place upon Defendants the obligation to properly account for and pay royalty interests to royalty owners under the mutual benefit rule and the implied duty to get the best reasonable price.

70.    At all material times, Plaintiffs and the Class and Subclass have performed their terms and obligations under the leases.

71.    Defendants breached the leases, including the implied covenants, by their actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream.

72.    As a result of Defendants' breaches, Plaintiffs and the Class and Subclass have been damaged through underpayment of the actual amounts due.

## COUNT II
## BREACH OF FIDUCIARY DUTY
**(for Oklahoma Subclass and Class Members in Oklahoma Wells)**

73.     Plaintiffs and the Subclass and Class Members in Oklahoma wells incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

74.     The Subclass members and Class Members in Oklahoma wells have interests in Oklahoma wells that have been unitized under 52 OKLA. STAT. tit. §§ 287.1-287.15 and/or 52 OKLA. STAT. tit. § 87.1.

75.     A fiduciary duty was created and vested when Defendants (or their predecessor(s) in interest) requested and received unitization orders from the Oklahoma Corporation Commission pursuant to those statutes.

76.     Defendants are the unit operator by appointment from the Oklahoma Corporation Commission for Class members.

77.     Defendants breached their fiduciary duty to the Subclass members and Class Members in Oklahoma wells by failing to properly report, account for, and distribute gas proceeds to the Subclass members for their proportionate royalty share of gas production.

78.     As a direct and proximate result of Defendants' conduct in breaching their fiduciary duties, Subclass members and Class Members in Oklahoma wells are entitled to recover actual damages.

79.     Plaintiffs and the Subclass and Class Members in Oklahoma wells are also entitled to and seek pre-judgment interest, post-judgment interest, attorneys' fees from the common fund, expenses, and costs.

## COUNT III
## FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD

80. Plaintiffs and the Class and Subclass incorporate by reference the allegations in all other paragraphs of this Complaint as if fully set forth in this section.

81. Defendants made uniform misrepresentations and/or omissions on the monthly check stubs sent to Class and Subclass members reflecting the wrong volume and price, and not detailing all of the monetary fee and in-kind volumetric deductions.

82. As set forth above, Defendants made a material representation that was false and/or omitted to state one or more material facts needed to make what was stated not misleading. Defendants knew when the material representations were made on the check stubs that the statements were false or misleading and/or at least made recklessly without any knowledge of their truth or made the statements with the intent that Plaintiffs and the Class and Subclass would rely on them. Plaintiffs and the Class and Subclass Members did rely on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were neither true nor accurate. Plaintiffs and the Class and Subclass Members suffered injury and were underpaid as a result.

83. Defendants also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Defendants had a duty to disclose to avoid presenting half-truths or misrepresentations.

84. Defendants undertook the duty to properly account by making the statements in check stubs on a monthly basis to royalty owners. By speaking on the issue, Defendants

had a duty to make full and fair disclosure of all relevant facts. This is especially so because Defendants had superior and/or specialized knowledge and/or access to information when compared to royalty owners.

85.    Defendants knew that their representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the actual facts to the royalty owners.

86.    Defendants knew the facts were peculiarly within Defendants' knowledge and that the Class and Subclass was not in a position to discover the facts pertaining to the proper volume, values, and constituents coming from their wells. Accordingly, having spoken on the subject matter, Defendants had a duty to make full and fair disclosure of all material facts such that its statements were not misleading, but did not.

87.    Defendants were deceitful by suggesting, as a fact, that the volume, price, value, and other statements were as set forth on the monthly check stubs when those statements were not true. Defendants knew the statements were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

88.    The misrepresentations and omissions were intentionally made. They were intended to suggest that the price was a third-party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, and that deductions would be shown on the check stub when in fact they were not.

89.    By creating and mailing misleading check stubs to the Class and Subclass, Defendants have fraudulently and deceitfully misled the Class and Subclass into believing

that the Class and Subclass Members had been paid on the full value of the production from their wells.

90.    Defendants acted intentionally or recklessly in disregard of the rights and implied covenants of Plaintiffs and the Class and Subclass Members, on a uniform basis, by not properly paying royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct Defendants' royalty payment practices such that punitive damages should be awarded and a finding should be made that Defendants acted intentionally and with malice toward Plaintiffs and the Class and Subclass Members subjecting Defendants to punitive damages.

91.    As a direct and proximate result of Defendants' tortious breach of implied covenant, deceit, and fraud, Plaintiffs and the Class and Subclass were underpaid monthly for royalties and are entitled to recover actual and punitive damages.

92.    In addition, the money wrongfully obtained by Defendants as a result of what should have been paid to Plaintiffs and the Class and Subclass should be held in constructive trust along with monetary interest for Plaintiffs and the Class and Subclass.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for an Order and Judgment against Defendants as follows:

      a.    That the Court determine that this action may be maintained as a class action and direct that reasonable notice of this action be given to members of the Class and Subclass;

b.    Appointing Plaintiffs as the class representatives, and Plaintiffs' Counsel as Class and Subclass Counsel;

c.    Awarding Plaintiffs and the Class and Subclass damages for actual damages for breach of lease, and interest at the highest allowable rate (such as lawful, equitable, or internal rate of return), as well as compensatory and punitive damages, breach of fiduciary duty, fraud, deceit, and constructive fraud;

d.    Granting Plaintiffs and the Class and Subclass the costs of prosecuting this action together with reasonable attorneys' fees out of the recovery;

e.    Granting such other relief as this Court may deem just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial on all matters so triable.

Respectfully Submitted,

*/s/ Rex Sharp*
REX A. SHARP KS 12350
BARBARA C. FRANKLAND KS 14198
SCOTT B. GOODGER KS 26480
Rex. A. Sharp, P.A.
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
bfrankland@midwest-law.com
sgoodger@midwest-law.com

AND

30

REAGAN E. BRADFORD
  (pro hac vice to be submitted)
MAGGIE ROBERTSON KS 24944
RYAN K. WILSON
  (pro hac vice to be submitted)
The Lanier Law Firm, P.C.
431 W. Main Street, Suite D
Oklahoma City, OK 73102
Telephone: (405) 698-2770
Reagan.Bradford@LanierLawFirm.com
Maggie.Robertson@LanierLawFirm.com
Ryan.Wilson@LanierLawFirm.com

**COUNSEL FOR PLAINTIFFS**